1                 **UNITED STATES DISTRICT COURT**

2                     **DISTRICT OF IDAHO**

3
UNITED STATES OF AMERICA,      )   CASE NO. 1:20-cr-00014-BLW
4                              )
                 Plaintiff,    )   **SENTENCING**
5                              )
             vs.               )
6                              )
NATHANAEL MICHAEL WEST,         )
7                              )
                 Defendant.    )
8                              )
_____ )
9

10

11            **TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**
               **BEFORE THE HONORABLE B. LYNN WINMILL**
12              **THURSDAY, DECEMBER 10, 2020; 9:01 A.M.**
                        **BOISE, IDAHO**
13

14
**FOR THE UNITED STATES OF AMERICA**
15        David Robins
          U.S. ATTORNEY'S OFFICE
16        1290 West Myrtle Street, Suite 500
          Boise, ID 83702
17
**FOR DEFENDANT**
18        Nicole Owens
          FEDERAL DEFENDER SERVICES OF IDAHO, INC.
19        702 West Idaho Street, Suite 1000
          Boise, ID 83702
20

21
Proceedings recorded by mechanical stenography, transcript
22 produced by computer.
_____
23

24            **TAMARA I. HOHENLEITNER, CSR 619, CRR**
               FEDERAL OFFICIAL COURT REPORTER
25        550 WEST FORT STREET, BOISE, IDAHO  83724

<u>I N D E X</u>

DECEMBER 10, 2020

**Proceeding**                                                    **Page**

Victim impact statement by Jethelyn Harrington.....  6
Recommendation by the Government...................  13
Recommendations by the Defendant...................  27
Court's comments and sentence......................  34

```
 1                      P R O C E E D I N G S

 2                      December 10, 2020

 3            THE CLERK:  The Court will now hear Criminal Case

 4     20-14, United States of America versus Nathanael Michael West,

 5     for sentencing.

 6            THE COURT:  Good morning, Counsel.

 7            Before we begin, let me recite the procedural posture

 8     of our proceedings today.  First of all, I need to note that we

 9     are conducting the hearing pursuant to the authority of the

10     CARES Act so this is being done by videoconferencing consistent

11     with the CARES Act.

12            Mr. West is appearing by videoconference and is not

13     physically present in the courtroom; likewise, his attorney is.

14     And all other participants other than the court reporter and the

15     courtroom deputy -- deputy clerk of court, are in the courtroom;

16     but other than that, everyone else is appearing by video.

17            Before we begin, under the CARES Act, I need to obtain

18     Mr. West's consent to proceed by videoconference and to be

19     voluntarily absent from the courtroom proceedings.

20            Mr. West, have you conferred with your attorney on

21     this issue?

22            THE DEFENDANT:  Yes, sir.

23            THE COURT:  And, Ms. Owens, do you -- can you concur

24     that you advised your client in this regard?

25            MS. OWENS:  Yes, Your Honor, we discussed it, and he
```

1    will waive his physical presence at this hearing.

2            THE COURT:  All right.  And Mr. West, do you agree?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Could you get a little closer to the

5    microphone, Mr. West, so we can hear you.

6            THE DEFENDANT:  Yes.

7            THE COURT:  Okay.

8            Now, to make these proceedings as open to the public

9    as possible, we have provided a call-in number in the notice of

10   hearing.  If any member of the public has called in to these

11   proceedings, they are reminded that recording the proceedings

12   even from a remote location is strictly prohibited, and they are

13   also reminded that they must keep their phone on mute so that we

14   do not hear any background noise that would interrupt the

15   proceedings.

16           Mr. West entered a plea of guilty to Count 1 of the

17   indictment.  The Court ordered a presentence investigation

18   report which has been provided to Court and counsel.

19           Mr. West, have you had a chance to read the

20   presentence report?

21           THE DEFENDANT:  No, but me and -- me and Ms. Owens

22   went over it multiple times so I'm familiar with what it says.

23           THE COURT:  All right.  Mr. West, do you struggle

24   reading?

25           THE DEFENDANT:  A little bit, yeah.

```
 1                    THE COURT:  Okay.  So was it, in essence, read to you

 2       by Ms. Owens?

 3                    THE DEFENDANT:  Yes.

 4                    THE COURT:  All right.  Ms. Owens, can you confirm

 5       that you have, in fact, reviewed the presentence report in

 6       detail with your client?

 7                    MS. OWENS:  I have, Your Honor.

 8                    THE COURT:  There were no objections to the

 9       presentence report.

10                    Do either of you intend to call witnesses?

11                    MR. ROBINS:  Your Honor, this is Dave Robins on behalf

12       of the United States.  I believe Ms. Harrington, a victim in

13       this matter, would like to give a victim impact statement.

14                    THE COURT:  All right.  We can allow that.

15                    Any other witnesses beyond that?

16                    MR. ROBINS:  No, Your Honor, no evidence, just

17       argument.

18                    THE COURT:  Ms. Owens, any witnesses from the defense?

19                    MS. OWENS:  No, Your Honor, just argument.

20                    THE COURT:  All right.  Why don't we start -- well,

21       first of all, I will start with the Government, but perhaps it

22       would be best, Mr. Robins, if you had Ms. Harrington offer her

23       comment at the outset in this matter.  I think that might be the

24       best approach, or you can incorporate Ms. Harrington's comments

25       into your argument as you see fit.  But we'll go ahead and hear
```

1      those arguments and the statements of the victim.  Mr. Robins.

2              MR. ROBINS:  Thank you.

3              Thank you, Your Honor.

4              Ms. Harrington, if I may, can you unmute your mike.

5      Ms. Harrington, would you like to give a statement at this time?

6              MS. HARRINGTON:  I would.

7              MR. ROBINS:  Now, Ms. Harrington, just for formal

8      procedure, could you please state and spell your name for the

9      record.

10             MS. HARRINGTON:  Certainly.  It's Jethelyn Harrington,

11     J-E-T-H-E-L-Y-N; Harrington, H-A-R-R-I-N-G-T-O-N.

12             MR. ROBINS:  Thank you, Ms. Harrington.

13             Please proceed with your victim impact statement.

14             MS. HARRINGTON:  Thank you.

15             I first met Nathanael West when he was the victim of a

16     severe aggravated assault in *State v. Bryant Brady* here in

17     Twin Falls.  In that case, Mr. West had been held at knifepoint

18     by Mr. Brady and threatened.

19             During our initial meeting, Mr. West expressed to me

20     his very real worries and mental shock and continuing suffering

21     he was experiencing due to being the victim of such a crime.  As

22     a prosecutor, I worked to allay Mr. West's fears, to break down

23     the criminal procedure process, and to answer his questions in

24     clear terms.  Mr. Brady was eventually sentenced to time in the

25     penitentiary for his crimes.  Mr. West and I met about a year

1    later the second time, but unfortunately, under very different

2    circumstances.

3        Mr. West's Twin Falls felonies began when he was

4    caught burglarizing cars in the courthouse parking lot.  He

5    broke into a sheriff's department car hoping to steal the dash

6    camera.  While officers were investigating those burglaries, as

7    he was caught almost immediately, Mr. West's then girlfriend,

8    Alexis Ellefrits, who is the other named victim in this case,

9    came to the scene, and told the officers that she and Mr. West

10   had been in an argument and that she had been looking for him

11   for some time.

12       During her conversation with the officer, Mr. West

13   called out to Ms. Ellefrits saying, "Why don't you tell them

14   about domestic the other day, bitch."  The officer pressed

15   Ms. Ellefrits for information, and she soon told

16   Mr. West -- soon told the officer, excuse me, that Mr. West had

17   strangled her about two days prior in front of a bar here in

18   downtown Twin Falls.  Mr. West was then charged by my office for

19   burglary in CR42-18-11567 and attempted strangulation in

20   CR42-18-11568.

21       Like most domestic victims, unfortunately,

22   Ms. Ellefrits was not the most cooperative of witnesses, and

23   could only be relied upon to testify if her father picked her

24   up, physically brought her to the courthouse, and then sat in

25   the courtroom the entire time.  Therefore, I came up with a plea

1      agreement wherein Mr. West would agree to plead to the burglary

2      charge, and the State would reduce the attempted strangulation

3      to misdemeanor domestic battery.  It was also readily apparent

4      to me, Your Honor, as I looked over Mr. West's extensive

5      juvenile history, plus his recent behaviors as described by

6      Ms. Ellefrits, that Mr. West was in need of mental health

7      treatment.  For these reasons, I thought it best that Mr. West

8      complete a retained jurisdiction program with the Idaho

9      Department of Corrections.  Mr. West and his defense counsel

10     agreed to this compromise, and Mr. West stipulated to a period

11     of retained jurisdiction.  He entered a plea of guilty to both

12     burglary and the amended misdemeanor and was sentenced that very

13     day.  I thought the cases were closed.

14          Soon after Mr. West arrived at his retained

15     jurisdiction program, he refused to cooperate with the classes

16     and treatment offered.  Judge Cluff revoked jurisdiction, and

17     Mr. West was sent to the regular prison population.  When I

18     received this notice, I remember thinking that Mr. West had

19     squandered a very good opportunity to get help.

20          By the time his letter arrived at my office, I had

21     completely forgotten about him.  And, Your Honor, I think that

22     anybody else, any other prosecutor would tell you that we have

23     so many cases and see so many people, we don't stay awake at

24     night wondering about defendants in our cases.  They are

25     sentenced, and they are gone and we move on.  In fact, I

1    couldn't remember who he was or any of his history until my

2    boss, Grant, pulled his files for me.

3         Judge Winmill, as much as I don't want to admit it in

4    front of him, just as he didn't want to admit in front of me

5    that Bryant Brady scared him, Mr. West's letter did frighten me.

6    Imagine being called down to your boss's office to find your

7    boss and your chief deputy waiting for you with the gravest of

8    expressions on their faces.  When I first arrived, I honestly

9    thought someone had died.  I thought they were going to tell me

10   that an officer had been shot.

11        As I began reading Mr. West's letter, I was mildly

12   surprised, but then came the line that he was going to kill not

13   only me but my entire family.  My children are elementary school

14   age and younger.  My husband is a water attorney.  Judge, my

15   distress at that moment was so great I thought my knees were

16   going to give away.  I thought I might pass out on the floor of

17   Grant Loebs's office.  However, I was trying --

18        (Audio interruption.)

19             MR. ROBINS:  Mr. Hatch, you are not muted.

20             MS. HARRINGTON:  Then came the line that Mr. West

21   planned to send my severed head to my mother.  I don't know why

22   exactly, but this line upset me the most of all.  Not because I

23   really feared having --

24        (Audio interruption.)

25             THE COURT:  Stop.  Just a moment, Ms. Harrington.

1        I'm not sure who that is.  That -- that is "Mr. Hatch"

2   is the name popping up.  That has to be muted.  We are hearing

3   everything you are saying, and it's disrupting the proceedings.

4        (Pause.)

5             THE COURT:  Ms. Gearhart, do you have ability to mute?

6             THE CLERK:  I do, And I just muted him, Your Honor.

7             THE COURT:  All right.  Thank you.

8             Go ahead.  I apologize, Ms. Harrington.

9             MS. HARRINGTON:  That's okay.

10       Not because I really feared that my head would be

11  severed, but because I knew the profound effect this line would

12  have on my parents.

13       So your mother -- Your Honor, my mother has a master's

14  degree, and is a very successful businesswoman; she runs two

15  businesses.  And she is hardworking, tenacious, and charitable.

16  But if she, level-headed business woman that she is, were to

17  know that her daughter received this kind of threat, she, like

18  any other mother, would go to absolute pieces.  Such stress

19  could potentially throw her out of remission from her severe

20  rheumatoid arthritis.  Therefore, she knows nothing about the

21  contents of Mr. West's letter other than that I received a

22  threat.

23       If my father knew about the contents of this letter --

24  well, let's just put it this way:  I'm glad we're on Zoom.

25       The night I received Mr. West's letter, my husband

1    left me at home to take our older child to swimming lessons.

2    There was a knock at the door, and I nearly jumped out of my

3    skin.  I was home alone with a baby.  The logical part of my

4    brain knew that Mr. West was in prison and the knock was only

5    from the UPS man, but my fear, Your Honor, was still palpable.

6    And for weeks following this incident, I had similar -- similar

7    things happen, and they still, in fact, happen.  For weeks

8    following this incident, my coworkers were afraid to let me walk

9    anywhere alone.  They followed me home from work.  In fact, I am

10   pretty sure that they are still keeping a lookout for strange

11   cars or any other unusual attention paid to me, as, of course, I

12   do for them.

13        After this letter, my husband and I installed a home

14   security system and have discussed the purchase of additional

15   guns for home protection.  My fears have been somewhat

16   alleviated when a retired California State Police sergeant moved

17   in across the street.  He is aware that I received a death

18   threat from a defendant, and he runs our neighborhood watch.

19        I had composed myself after receiving this letter, but

20   then came the news of the shooting death of Judge Salas's son

21   and the severe injury of her husband in New Jersey.  This case

22   served to remind me that irrational people are everywhere and

23   will exact revenge for any perceived injury in the most extreme

24   and tragic ways.

25        I would also like to address the impact that this

1    letter had on my office.  This greatly upset many people in my

2    office, not whom the least of which was my legal assistant who

3    at the time I received this letter had been working for me for

4    maybe two or three months.  She was extremely upset by this.

5    She is a sensitive soul, and I thought -- I honestly thought she

6    was going to quit.  Luckily, she is still with me.  But to see

7    her reaction broke my heart.

8         I would now like to address some remarks to Mr. West

9    personally.

10        I cared about you.  I comforted you when you were in

11   distress, but instead you chose to victimize me in the same way

12   Mr. Brady victimized you.  Worse still, you involved my innocent

13   children.  Why would you behave this way?  What could possibly

14   have convinced you that your actions were acceptable?

15        Furthermore, in your letter, you blame me for turning

16   Ms. Alexis Ellefrits against you.  I'm not the one who strangled

17   her.  I'm not the one who hit her and called her names, and I'm

18   not the one who threatened to kill her.  You are responsible for

19   turning Ms. Ellefrits against you.  You are to blame.  You

20   refuse to take possibility for your actions.  I had nothing to

21   do with it.

22        Judge Winmill, I have absolutely no doubt in my mind

23   that Mr. West will choose to blame his behavior in this case on

24   his mental health.  However, I find that extremely offensive.

25   There are millions of people who suffer with mental health

1    issues who are law-abiding citizens, some of whom are my close

2    friends and family members.  Such excuses make it seem that

3    mentally ill people have no control over their behavior and will

4    commit crimes without warning.  Such justifications add to the

5    stigma of those who suffer from mental illness and they are

6    extremely unfair and unjust.

7         Mr. West knew exactly what he was doing in this case.

8    He was angry because his girlfriend left him.  Instead of

9    reflecting on his behavior having produced this outcome, he

10   chose to blame someone else, and that person was unfortunately

11   me.  His irresponsible choice has had a profound affect on my

12   life, the life of my family, and the lives of my coworkers.  For

13   these reasons, I ask that you sentence Mr. West to prison:  One,

14   so that he may receive further treatment for his mental health

15   and criminal thinking errors; two, so that the public may be

16   protected from a man who refuses to take responsibility for his

17   own actions; and, three, as a deterrent so that no other

18   prosecutor has to suffer what I have suffered for simply doing

19   my job.

20        Thank you.

21        THE COURT:  Thank you, Ms. Harrington.

22        Mr. Robins.

23        MR. ROBINS:  Yes, Your Honor.

24        Thank you, Ms. Harrington, for your remarks.

25        She clearly is a very capable and talented prosecutor,

1     and to some extent she stole a bit of my thunder.

2          But the Government has filed a memorandum in this

3     case, Your Honor, so I think you're aware of our position and

4     our view on the crime.  We believe this to be a sadistic, cruel,

5     unjustified, and inexcusable malum in se offense against

6     completely innocent victims.  His crime reflects an assault not

7     just on Ms. Ellefrits and Ms. Harrington but on the criminal

8     justice system, given her role, and the civil society that is

9     protected by the criminal justice system.

10          Furthermore, his crime, as is evident from

11     Ms. Harrington's statement today, has given extreme

12     psychological harm to her, and this harm was intentionally and

13     purposely inflicted on them, and it will echo in their lives for

14     years to come.

15          The defendant has been offered rehabilitative

16     treatment, counseling, support, and education throughout his

17     life, yet he sits before you incorrigible and unrepentant.

18     Given that his crime was committed against the backdrop of a

19     reprehensible criminal history, antisocial conduct, and

20     criminality, the Government respectfully recommends according to

21     our memorandum.

22          Now, Your Honor, I am recommending a variance upwards.

23     I believe the guidelines have failed to take into account the

24     following: the multiplicity of victims, the especially

25     derogatory nature of the letter, the psychological harm

1    inflicted upon the victims, the fact that it was calculated to

2    inspire lasting terror in the line that "I won't be in prison

3    forever," the fact that the victims are wholly innocent, the

4    fact that his threats are an attack on the criminal justice

5    system, given that he has also done this before; and the

6    defendant, while taking responsibility for his crime, never

7    denounced his intentions to carry out the threats when asked by

8    law enforcement.

9          But may I remind the Court when they asked, "Do you

10   intend to carry out these threats?", he said, "Probably not."

11   He didn't say, "No."

12         In addition, Your Honor, the policy statements of the

13   guidelines also support this motion -- not motion, but this

14   argument for an upward variance.  There is 5K2.3 for infliction

15   of extreme psychological injury.  There is 5K2.7 for disruption

16   of government function.  This was a threat on a prosecutor.

17   There is 5K2.8 for extreme conduct if the defendant's conduct is

18   unusually heinous, cruel, brutal, or degrading to the victims.

19   And I believe those policy statements in the guidelines support

20   an upward variance when taking into account the 3553(a) factors.

21         Now, Your Honor, I will not belabor all the analyses

22   in my memorandum; I know that the Court has read it.  But I

23   would like to address some of the arguments given in the

24   defendant's sentencing memorandum.

25         The defendant has melded two penological concepts that

1    I believe need to be untethered from each other if they are to

2    be addressed intelligently.  First, there are the hardships of

3    his youth.  Second are his mental health conditions.

4         As for the hardships of his youth, Your Honor, this

5    standing alone does not bear on sentencing.  There is no point

6    to it.  The defendant may have brought forth his hardships with

7    a wish to inspire sympathy for him and hope that an emotional

8    reaction will result in a reduction of punishment, but that is

9    not appropriate under our law.

10        First is that sympathy is not included in the 3553(a)

11   factors.  While you are allowed to consider the history and

12   characteristics of the defendant, you look to that to serve the

13   points of paragraph 2, which are rehabilitation, deterrence,

14   punishment, and protection of society, not to give him sympathy.

15        Second, if we are to incorporate sympathy, it would

16   vary wildly from court to court, and that would promote great

17   inconsistency in law which is not something that we should do.

18        THE COURT:  Mr. Robins, let me ask you on that point.

19   Of course, one of the 3553(a)(2) factors is the need to promote

20   respect for the law and to impose a just sentence.  Doesn't the

21   circumstances of the defendant's childhood, doesn't that bear in

22   some way upon what is a just sentence, what appropriately

23   captures the culpability of the individual?

24        And let me point out -- I'm sure Ms. Harrington has

25   seen this; I know you have.  I would say that the average

1    defendant in a drug case was probably introduced to drugs by a

2    family member, often a parent, as early as 11 or 12 years old.

3    Average is not correct.  That's an overstatement.  But I think

4    it's clear.  It's hard for me to see how in a situation like

5    that that what happens to a child when they have no choice over

6    their living arrangements; no choice over their treatment by

7    their parents; no control or choice over whether they are abused

8    physically, emotionally, or sexually; no control over how that

9    may affect their psyche and their mental health -- in this case

10   the defendant has an IQ of 70, which is probably -- well, you

11   know, it's in the bottom, I think, 2 percentile.  He has mental

12   health issues that are of great significance.

13          Now, how can that not in some way bear -- I will

14   preface this -- this is for you and Ms. Owens.  As I read

15   through the materials in this case, I thought this case presents

16   kind of the classic ethical dilemma, one in which there really

17   is no choice.  As you pursue one goal, it takes you further away

18   from the other moral objective you may want to achieve.

19          The only way to truly protect society and to give

20   Ms. Harrington absolute confidence is a lifetime prison

21   sentence, but a lifetime prison sentence may be problematic

22   because it doesn't take into account these issues of relative

23   culpability, of someone who didn't choose to be mentally ill,

24   didn't choose to have an IQ of 70, didn't choose to be raised

25   under horrific circumstances, didn't choose to be abused as a

1    child.

2           And that's why I say, it's why being a judge is often

3    an impossible situation because we confront an ethical dilemma

4    that simply cannot be resolved, and I think unfortunately,

5    judges too often just split the baby, maybe because they have no

6    other answer.

7           So I just wanted to comment on that because I -- I

8    guess I do have to say that I reject the notion that childhood

9    experience is not relevant to sentencing.  I reject that.  I

10   think it is very relevant.  I think it is sometimes overstated

11   as a factor.  But I think you and I have both seen cases where

12   we are just staggered by the treatment that 10-, 11-,

13   12-year-old children have received at the hands of parents that

14   can best be described as not only incredibly inept but even

15   almost evil.

16          So I just want you to know that I understand that, and

17   I hope Ms. Harrington does not take this as undermining or not

18   being sensitive at all to her concerns, because I clearly am.

19   That's the other prong of that ethical dilemma, the need to

20   protect society.

21          So I just want you to understand that, and I would

22   like you to address my concerns, if you would.

23          MR. ROBINS:  I would be happy to, Your Honor.

24          First off, empathy is one of humanity's noblest

25   traits, and I do encourage it; in this Court in particular, I

1    admire it.

2            Now, Judge, what you did touch on that I appreciate is

3    when you mentioned addiction as a youth.  If you can explain

4    circumstances in youth that led to a problem that can be

5    addressed by the criminal justice system, then it makes sense,

6    if we know that the addiction started in youth, if we knew that

7    there was a mental health treatment option that stemmed from

8    terrible childhood circumstances, those circumstances are

9    relevant in fashioning a sentence which serves the first duty of

10   sentence, which is protecting the community.

11           So to put it simply, imagine an equation for me:  Dad

12   did not attend my ball games; therefore, I deserve a lesser

13   sentence.  That's not appropriate.  What it should be:  Dad did

14   not attend my ball games; I have manic depression.  You can

15   treat the manic depression with a sentence to reduce the

16   possibility of crime, and that serves the first duty of

17   protecting society.

18           And the guidelines do support me on that, Your Honor.

19   5H1.12 provides that, quote, "The lack of guidance as a youth

20   and similar circumstances indicating a disadvantaged upbringing

21   are not relevant grounds in determining whether a departure is

22   warranted."  Now, that applies to departures, not variances.

23           But the guidelines acknowledge that there is some

24   difficulty with just meting out sympathy.  To the extent that

25   circumstances inform the best sentence to rehabilitate, deter,

1    and punish, yes; but sympathy standing alone is problematic.  If

2    it becomes the coin of the realm in sentencing, Your Honor, we

3    would promote somewhat of the victimhood olympics that we see,

4    and the evidence is hardly ever reliable, as you well know -- to

5    have little ability to refute things asserted by the defendant.

6         And fourth, if sympathy became it without being

7    connected to other penological interests and things we can

8    address such as addiction and mental health, we would create a

9    subgroup of privileged offenders.  Those who grew up in a ghetto

10   can count on a lesser sentence than those who grew up

11   privileged.  That standing alone doesn't seem to provide just

12   reason for disparate treatment.

13        THE COURT:  Let me ask you to look at it a little bit

14   differently.  Because I'm not suggesting in any way that a judge

15   should impose a sentence based upon sympathy and empathy.  But

16   if a crime can be tied directly to a mental health problem or

17   can be tied directly to a substance abuse problem which began at

18   a very young age, is not -- you know, when someone is 10, 11, 12

19   years old, is that not relevant?

20        I mean, I'm not talking really about sympathy or

21   empathy.  I'm talking about addressing what causes criminal

22   behavior.  I made a statement not too long ago -- I think maybe

23   two weeks ago -- in which I have a very hard time sentencing

24   someone to prison simply because they are mentally ill.  And if

25   the crime is completely the result of a mental illness, which

1    the defendant did not invite, did not ask for, how can that not

2    be relevant in terms of moral culpability?  How can that not be

3    relevant in terms of a just sentence and promoting respect for

4    the law among our citizens?

5           Now, having said that, the jury is somewhat out on the

6    mental illness.  I mean, I think it seems clear that Mr. West

7    suffers from that, but I'm not sure it's as clearly spelled out

8    as I would like to see it.  But that's where my concerns are:

9    Not that I am empathetic; I agree a difficult childhood is not

10   relevant, but if that difficult childhood results in mental

11   health issues which in turn causes them to turn to crime, then I

12   think it is relevant.

13          MR. ROBINS:  I agree with you, Your Honor.  On that, I

14   think perhaps I have not given my argument the precision it

15   needs.

16          When I read the defendant's sentencing memorandum, it

17   focused half on just a horrible childhood and the other half on

18   mental illness.  Now, the part that focuses on a horrible

19   childhood seemed calculated simply to inspire sympathy, and

20   that's all I'm seeking to address.

21          Now, addressing mental health concerns and addressing

22   substance abuse concerns, absolutely the Court should consider

23   those as predominant factors in fashioning a sentence.  But my

24   simple point was arguing that empathy and sympathy alone for a

25   hard childhood is not sufficient or should not be considered,

and I'm simply reflecting the guidelines of section 5H1.12.

THE COURT:  Let me say that I agree with you on that score.

MR. ROBINS:  So we do agree, Your Honor.

I'm sorry.  That's what I was trying to do; I was trying to separate the concepts that seem to be melded in the defendant's sentencing memorandum.  There is a heavy emphasis on sexual graffiti and the living conditions, and to the extent that that informs the mental health, yes, we do need to address the mental health.

But I also analyze these facts with the first duty of sentencing, as the Government recommended, is to put protection of society first.

But now that I have addressed the adverse childhood circumstances -- and I hope the Court doesn't walk away with the impression that I'm not empathetic.  I certainly am, Your Honor. I have a great swelling of sympathy and empathy for Mr. West in growing up the way he did, but what I am saying is that does not serve as out a get-out-of-jail-free card that can be used for the rest of his life in criminal actions.  He needs to be held accountable; so I just ask that the sympathy be discounted, and let's address his mental health.

Now, that we have talked about adverse childhood circumstances, his health conditions do play a role in sentencing.  As they apply here, I would like to offer my

1  analysis.

2        As the Court pointed out, the IQ of 70 is low to

3  borderline, but I'm not sure that the evidence is too clear on

4  exactly how bad this has impacted him.  The low-to-borderline

5  analysis was in Exhibit No. I.  In other parts, he was diagnosed

6  with, quote, "a mild intellectual disability" in Exhibit J.  We

7  are not dealing with severe mental retardation.  And

8  additionally, at least one expert concluded that the exhibits

9  that he -- and I'm quoting here -- "exhibits simultaneous

10  malingering and faking good behaviors," Exhibit J.

11        It does not appear that he is extremely disabled,

12  disturbed, or otherwise compromised.  He was able to appreciate

13  the wrongfulness of his conduct, and he was able to conduct

14  himself according to law.  This is not a question of diminished

15  capacity.

16        The other thing about this, Your Honor, is, as I

17  pointed out in my sentencing memorandum, it's not a

18  heat-of-passion crime like repeatedly stabbing somebody.  This

19  was deliberate.  This took time to write, took time to put in

20  the mail, and it took time to send.  Those are all intelligent

21  actions that demonstrate subsequent rational thought.

22        So when I look at trying to explain the defendant's

23  conduct, the defense tries to explain this as being the genesis

24  of mental health, and I don't believe the evidence suggests

25  that.

1          You have a competing interpretation for the

2    defendant's actions, Your Honor.  What does explain how and why

3    he committed these crimes?  Well, read the contents of the

4    letter.  He blamed the prosecutor and the witnesses against him.

5    He was upset that he was in jail.  He was upset that his

6    girlfriend left him, and he wanted revenge.  He wanted to feel

7    good knowing that he had harmed those who he perceived had

8    harmed him, and the only way to do that was to write the heinous

9    letter and send it.  That was a very conscious, deliberate, and

10   reflective choice that agrees with the common sense

11   interpretation of the facts of this case.  That was not a

12   function of intellectual disability or posttraumatic stress

13   disorder.  This was a calculated and deliberate, sadistic act of

14   revenge.

15          So the role that mental health has in this I don't

16   believe explains this crime at all.  I mean, it may inform to

17   some extent his ability to calculate risk and feelings, but what

18   he did was clearly a human and sadistic act.

19          As Ms. Harrington pointed out and as I have often

20   argued in my capital and murder cases, which invariably turn

21   into mental health trials, there are a number of people who

22   suffer as the defendant does.  Half of our citizens have IQs

23   under 100.  Now, he represents a further distribution, but many

24   people suffer as he does.  But how many people have written

25   letters like this?  I would suggest that common sense informs us

1    that mental illness is not the cause of his crime but is a

2    reflection of his choice, and that needs to be addressed.

3         The other analysis -- and I think I'm touching on what

4    Your Honor struggles with as well -- if you are confronted with

5    a defendant who is so mentally ill, what do we do with them?

6    Well, I do suggest to the Court that the first duty of a

7    sentence is to protect the community.  If he is indeed so

8    mentally disturbed that he poses a threat, the solution is not

9    to let loose the jailhouse doors, but it is to keep him there.

10   I do not think that jail is the best place to treat mentally ill

11   people, but mentally ill people who commit crimes, particularly

12   violent crimes against others, need to be segregated from

13   society.  So to that extent, we think prison would be

14   appropriate.  And I'm not making this up.  I draw strength in at

15   least persuasive citation to the guideline manuals.

16        The defendant in their memorandum in I here cites

17   5H1.3, mental and emotional conditions.  I cite that for the

18   proposition that mental and emotional conditions may warrant a

19   downward variance or departure.  But what is missing from the

20   defendant's analysis is that the departure only applies to

21   nonviolent offenses, and the guidelines make that clear.  If the

22   defendant is violent or threatening, mental and emotional

23   conditions will never justify a downward departure.

24        This is also reflected in 5K2.13, diminished capacity.

25   "Even though the defendant may have operated with a diminished

1 capacity, a downward departure is prohibited by the guidelines

2 if the defendant's offense involved actual violence or a serious

3 threat of violence."

4   The guidelines recognize the reasons I have espoused

5 here today, Your Honor, that the first duty of sentencing is to

6 focus on protecting the community, protecting the community.

7 The defendant may have mental health issues.  That does not

8 justify placing the community at increased risk.

9   Now, lastly, in parting, Judge, I would like to

10 address what I believe is a fundamental flaw in the defendant's

11 position, and there is a lack of identified plan to address his

12 violence, his mental health.  There has not been a finding by

13 any expert that he is not high risk.  There are no firm plans

14 with any prognoses identified that I think can address the

15 concerns of any potential violence the defendant might

16 demonstrate.

17   The defendant has also further claimed in their

18 memorandum that he lacks the intellectual ability to carry out

19 his threats.  I find that to be untrue.  He has been violent in

20 the past.  And, of course, logic tells us that he is not so far

21 removed that he wouldn't have the ability to make any such

22 calculations and carry them out.  It doesn't take a lot of

23 intelligence to commit an act of violence.

24   As for that, Your Honor, given the full balance of

25 this case, the conduct, the most logical explanation that this

was a rational choice done to inflict fear, we believe that a

sentence of 50 months consecutive to his current prison sentence

would be appropriate and best to meet the 3553(a) factors.

With that, I appreciate you for hearing my argument,

and I respectfully submit.

THE COURT:  All right.  Thank you.

Ms. Owens.

MS. OWENS:  Thank you, Your Honor.

Your Honor, I think that I have struggled with this

case in the same way that you have reflected, which is that

there are two considerations that have to be balanced here.

Certainly, the crime itself, the nature of the crime, the harm

done to the victim; that's no -- that's no small consideration,

and that wasn't lost on me as I read the police reports in this

case.

And then as I began to prepare the case and I

requested the records for Mr. West -- and I think the Court has

seen, frankly, just a small glimpse into those records.  He has

thousands of pages of Child Protection Services records, of

health and welfare records, of reports, of documentation about

the neglect, abuse, and impact of his childhood on his life.

And that's the other consideration for the Court.  And the Court

has to weigh those two things.

Your Honor knows that mental health, childhood

experience, neglect, abuse, those things are not presented to

excuse behavior.  Instead, they are presented to explain how we got here, the backdrop.  That's important.  That's important to show who someone is and what motivated them.

Child Protective Services began to be involved in Mr. West's life when he was 2 years old.  At that time, they had found he had been locked in a room, that he didn't have sufficient food.  And when you investigate his parents and their history, this is an intergenerational problem.  His grandfather had gone to prison for sexually molesting his mother.  That same grandfather would later -- at 3 years old -- sexually abuse Mr. West.

I don't bring this up for sympathy, although it certainly draws upon the heartstrings.  I bring this up to explain who Mr. West is, his history and circumstances.

THE COURT:  Ms. Owens, let me ask.  This is another aspect of that ethical dilemma that I alluded to.  The more empathy that is created by pointing to how deep-seated and almost -- and perhaps even literally genetically based these problems are, you are almost arguing against yourself because you are suggesting that the problems are so deep-seated that they cannot be resolved without great difficulty, perhaps a substantial period of time; and that in turn suggests that a long prison sentence may be necessary to increase the time for treatment but more importantly to just protect society for a longer period of time.

1          And that, again, is part of that ethical dilemma.

2     This case -- I mean, I think I see a case somewhat like this

3     every week that I defy any impetus to find a sentence which does

4     not in some way just fall apart upon very close examination

5     because you cannot resolve these competing considerations that

6     just are at complete cross purposes.

7          So here is my -- I'm going to make an observation and

8     I want you to address it, similar to what I asked Mr. Robins.

9     To me, there is a crying need for us to provide the defendant

10    with as much mental health treatment as possible.

11         Now, I know, and the Ninth Circuit has made clear,

12    that we should never sentence someone to prison for

13    rehabilitation because it just isn't going to happen; but it may

14    not be happening outside prison walls either, and at least there

15    will be some provided.

16         But you reach a point, of course, where nothing more

17    is going to be done, and I don't know where that point is.  Is

18    it 12 months in a federal prison?  Is it 24?  Is it 36?  Or is

19    it 50?  At the point you reach the position where nothing more

20    is really being done in a positive way to resolve mental health,

21    then the sentence becomes nothing more than punitive.  And it

22    seems to me that the only appropriate sentence is to find that

23    sweet spot and to determine when will we have maximized the

24    opportunity for psychiatric treatment and when will we reach a

25    point of very diminishing returns.  That's one thought.

1           The other thought I have is I'm concerned that a fully

2      concurrent sentence as you've requested means he would

3      effectively either never come into federal custody or would come

4      in only for a very short period of time, and my sense is that

5      there are better resources for mental health treatment in a

6      federal prison than in a state prison.

7           So, you know, I lead with my chin during these

8      sentencings.  I try to let counsel know exactly what I'm

9      thinking.  I don't try to hide anything because I think it's

10     important that we discuss these things.

11          So those two notions:  The idea that some period of

12     incarceration to give him whatever treatment, mental health

13     treatment that can be provided by the Federal Bureau of Prisons,

14     finding that sweet spot where we are now getting diminishing

15     returns; and then, secondly, the concern that a fully concurrent

16     sentence would, in essence, be no sentence on this charge.

17          MS. OWENS:  Your Honor, I think that those -- I think

18     the Court has hit exactly what the considerations are.

19          I think that it is important that we get him treatment

20     and help.  I don't think that that is exclusively mental health

21     treatment.  I think there are a number of factors going on here

22     when you look at again the background and history, frankly, just

23     life skills.  He has never had a checking account.  I don't know

24     how we expect someone to be successful and to be rehabilitated

25     when they don't just have basic life functioning skills, and

1    those were never presented for him.  They were never mirrored

2    for him.  His homes never had food in them.

3         So I don't think this is an exclusively mental health

4    case, although I agree that's a component.  I think that the

5    Court has to consider that, that just warehousing somebody

6    without addressing rehabilitation and treatment, I think we get

7    diminishing returns on that.

8         I think he needs more than treatment in the

9    penitentiary.  I think that that's a component of it, but I

10   think that some of the Court's concerns can be addressed through

11   supervision and those life skills and that mental health

12   treatment in the community.  I think that has to be a part of

13   the sentence is supervised release and somebody helping mirror

14   and support him in the community so he can be successful.

15        I look at his history, and I think the system has

16   failed him.  I don't -- I don't see where somebody in foster

17   care, who was abused in foster care, was given the opportunity

18   at treatment and rehabilitation.  I recognize he was sentenced

19   to a rider, but I also think you have to take into account the

20   cognitive disadvantage that he is at, just in reading, in

21   understanding material.  I think he really needs intensive help,

22   and I agree at some point I start arguing against myself.

23        I don't know that we have the right tools to address

24   it, but I think that the Court needs to consider a sentence

25   where he can get treatment, and he will get treatment in the

1       state penitentiary as well as the federal penitentiary.  He will

2       also get treatment and help on supervision in both the state and

3       federal court systems, and I -- I hope that those treatments are

4       adequate to provide him the skills he needs.  I mean, he is 23

5       years old.  He is very young.  He has his whole life ahead of

6       him.

7               I think that these are difficult considerations, but I

8       think that the Court has tuned in exactly to what the

9       considerations are.

10              THE COURT:  Counsel, I need to apologize.  I just

11      noted that I think the jail has another sentencing at 10:00, and

12      I have droned on here far too long, and it has taken more than

13      what we had anticipated.

14              And so I don't want you to cut yourself in any way,

15      Ms. Owens, but I would ask you to make sure that you cover your

16      points just in the off chance that they literally cut us off

17      since they have another hearing in 12 minutes.

18              MS. OWENS:  Sure.

19              Your Honor, again, I think that his assertions from

20      background and history are supported by ample evidence.  We have

21      provided that evidence.  They are documented.  They are

22      presented to explain his background and history.

23              Your Honor, they are also presented to explain that he

24      never really had a family, and that's important because the

25      first family he really ever had was one of the victims in this

1    case.  And so when that began to fall apart -- and he certainly

2    takes responsibility for his part in that -- he began to lose

3    the really only family he ever had.  And that motivated his

4    actions in this case.

5            He recognizes -- we have talked extensively over the

6    time that he has been in custody, for which he gets no credit on

7    this case, Your Honor.  I think that's an important point to

8    make.  He has been in custody for almost a year.

9            And we have spoken about the conduct here in this case

10    extensively.  He is sorry.  Now, he doesn't deny that he did it,

11    and he recognizes that at the time he was motivated because he

12    was hurt.  You know, the prosecutor herself mentioned that the

13    victim was unwilling to, on her own, participate in that

14    prosecution, and so he saw these resources being levied against

15    him to facilitate that prosecution, and he reacted

16    inappropriately.  He knows that, and we have talked about that,

17    but he acted out of hurt.  It was a reflex.  He had no intention

18    of acting on those threats.  And I know that those are hollow

19    words by his attorney years later, but I do think it's important

20    to say that he had no intention of acting on those threats, but

21    the threats themselves were the action.  He knows what he did

22    was wrong, he knows why it was wrong, and he is sorry for his

23    actions, and we are here today to sentence him for those

24    actions.  And there is a lot of considerations that we have

25    talked about today.

1          And so we believe that all the reasons we have laid

2     forth in our sentencing memorandum, that are encompassed in the

3     presentence report, and that are presented before Your Honor

4     warrant a sentence of 24 months.  He has been in custody for

5     almost a year, for which he gets no credit on this case.  We ask

6     the Court to consider rehabilitating him in the community as

7     well as in custody, and for those reasons we think that the

8     sentence is appropriate.

9          Thank you.

10          THE COURT:  All right.  Thank you, Ms. Owens.

11          Mr. West, is there anything you would like to say in

12     your own behalf?  Please make sure you're close to the

13     microphone so we can hear you.

14          THE DEFENDANT:  No.

15          THE COURT:  There is nothing you wish to say, sir?

16          THE DEFENDANT:  No.

17          THE COURT:  All right.  Counsel, because of the time

18     constraints that we're operating under, at least to some extent,

19     I'm going to go through a little more -- in a little more

20     truncated fashion than I normally do explaining my sentence.

21          I assume, Mr. Robins, you would move for the third

22     level?  I think that's relevant in this case but perhaps not.

23     Actually, it's not.  It's not.  I apologize.  The base offense

24     level did not exceed 16 so it's not involved here.

25          The case speaks for itself.  I'm not going to describe

1    -- I think Ms. Harrington's comment clearly spelled out exactly

2    what happened.  I think the one thing that perhaps was not

3    explicitly mentioned is that the defendant wrote a similar

4    letter to the Valley County, Idaho, prosecutor in May of 2015,

5    but the prosecution elected not to pursue charges.  So that does

6    become concerning because it shows a propensity to do this, that

7    was uninhibited after being probably warned/threatened with

8    prosecution when that occurred five years ago.

9         The defendant's background is horrific.  There are

10   serious, serious problems.  He was raised in a violent, chaotic,

11   unstable life.  Turned to methamphetamine.  He is only 23 years

12   old.  He has apparently an IQ of perhaps 70.  Now whether that's

13   locked in or whether -- you know, those vary from time to time,

14   but it is not lost on me that under current Supreme Court

15   jurisprudence an individual with an IQ of 70 would not be

16   eligible for the death penalty because of their lack of

17   comprehension of the significance of their decisionmaking.

18        I don't think I need to discuss it much more.  The

19   3553(a)(2) factors to me are really the heart of any sentencing

20   decision.  I will just note and remind counsel that the Court is

21   directed by the statute to impose a sentence which is sufficient

22   but not greater than necessary to achieve those objectives, all

23   of which we have been talking about.

24        I agree with both of you.

25        With Mr. Robins, I absolutely agree that first and

1    foremost our obligation is to protect the public.  The question

2    is is a 36-month sentence as recommended by the probation office

3    going to give less protection to the public than a 50-month

4    sentence?  The answer is yes, but only because the defendant

5    would be removed from the public for 14 months.  Otherwise,

6    there would be no difference whatsoever.

7         I agree with Ms. Owens that what the defendant

8    desperately needs is treatment.  And if I had it within my

9    ability to sentence him directly to a mental health facility

10   where he could receive mental health treatment rather than be

11   incarcerated, I would do that in a heartbeat, but unfortunately,

12   we don't have that as an opportunity or an option for the Court.

13        So I'm left with this incredibly imperfect situation,

14   this ethical dilemma as I've described it.  I don't have any

15   clear answer except perhaps, as I suggested to Ms. Owens, that

16   to me the appropriate sentence is the sentence in which we can

17   provide him with some minimal mental health and substance abuse

18   treatment within the penal setting, but when we have reached a

19   point of diminishing returns, then that's probably when the

20   sentence needs to end.  Now, unfortunately, I don't have a

21   perfect fix on that, and all I can do is do the best job I can.

22        I should note the guideline range I think is 30 to 37

23   months.  I'm trying to hurry here because I know we have a jail

24   that's trying to kick us out the door.  But I think that's all

25   in the -- I'll adopt the presentence report as my own findings

1        in this matter.

2               So with that, I'll go ahead and pronounce sentence.

3               The defendant having pled guilty to Count 1 of the

4        indictment and the Court being satisfied that you are guilty as

5        charged, I hereby order and adjudge as follows:

6               Pursuant to the Sentencing Reform Act of 1984, it is

7        the judgment of the Court that you be sentenced to the custody

8        of the Bureau of Prisons for a term of 36 months to run

9        consecutive to the sentence that the defendant is now serving.

10              I don't have those case numbers.  I can look them up.

11       Perhaps, Ms. Smith, you can send me a text message so I can

12       recite those for the record while I proceed to impose the

13       additional sentence that needs to be completed here.

14              The defendant will be required to pay a special

15       assessment of $100, which will be due immediately.

16              The Court will find that the defendant lacks the

17       ability to pay a fine.  Accordingly, the fine will be waived in

18       this matter.

19              All monetary penalties are due and payable

20       immediately, but after considering Mr. West's financial

21       resources, I will order payment under the following schedule

22       unless modified by the Court:

23              While in custody, he will submit nominal payments of

24       not less than $25 per quarter pursuant to the Bureau of Prisons

25       Inmate Financial Responsibility Program, and during the term of

1    supervised release, he will submit nominal monthly payments of

2    10 percent of his gross income but not less than $25 per month.

3          Supervised release will be imposed for a period of

4    three years.  During that period of time, he will comply with

5    all of the mandatory, standard, and special terms of supervised

6    release as is stated in the sentencing recommendation filed by

7    Probation Officer Lee as Docket No. 28 in the Court's written

8    record in this proceeding.

9          Ms. Owens, have you gone over those conditions with

10   your client?

11         MS. OWENS:  Your Honor, I have.

12         THE COURT:  Are there any objections to any of them?

13         MS. OWENS:  No, Your Honor.

14         THE COURT:  Mr. West, do you have any questions about

15   those conditions?

16         THE DEFENDANT:  Yeah.  So I only have one.  Am I going

17   to be going to the feds first or back to state for my last few

18   years?

19         THE COURT:  Well, you're going to go back to state.

20   I'll let Ms. Owens counsel you on that, but my understanding is

21   you will go back to state and finish the sentence there and then

22   go into federal custody.

23         I will indicate that I would have -- in fact, I would

24   encourage the State of Idaho to parole you as early as possible

25   so that you can get into federal custody.  I think that is where

1        you probably should serve the balance of the sentence.

2              And so, Ms. Owens, feel free to get a copy of the

3        transcript, and you can show that to Mr. West's attorney who

4        will represent him before the Parole Commission and perhaps get

5        an earlier release date so that he can go into federal custody

6        as soon as possible.  All right?

7              Now, I need to advise you as well, Mr. West, that if

8        you violate the conditions of supervised release, you understand

9        that you will be brought back before the Court, and a further

10       sentence of incarceration will be imposed?

11             THE DEFENDANT:  Yes.

12             THE COURT:  All right.  There is no plea agreement in

13       this case so I will just advise you that you have the right to

14       pursue an appeal.  To do so, you must file a notice of appeal

15       within 14 days after judgment is entered in your case.  If

16       unable to pay the cost of an appeal, you may apply for leave to

17       appeal in forma pauperis.  If you so request and qualify, the

18       clerk of the court will arrange for legal representation and

19       will prepare and file a notice of appeal on your behalf.

20             I would note, I believe the case number is Twin Falls

21       Case No. 42-18-11567 that Mr. West is currently serving and that

22       the sentence in this case will run consecutive to his sentence

23       in that.

24             I will recommend to the Bureau of Prisons that

25       Mr. West receive credit for any time he has served in federal

1    custody.  I'll recommend that he be placed at a facility which

2    will provide him with the best opportunities for mental health

3    and substance abuse treatment and that he be allowed to

4    participate in the RDAP drug treatment program, which I strongly

5    recommend because there is a component of transitioning into the

6    community which I think meets some of the concerns that

7    Ms. Owens had that he needs treatment in the community setting

8    as well, and I think the RDAP program might maximize the

9    opportunities for that and also slightly reduce his sentence.

10           Counsel, I think we have run over time, but I still

11   want to make sure I haven't missed anything.

12           Mr. Lee, have I overlooked anything?

13           THE PROBATION OFFICER:  No, Your Honor.

14           THE COURT:  Ms. Smith?

15           LAW CLERK SMITH:  No, Your Honor.

16           THE COURT:  Ms. Gearhart?

17           THE CLERK:  No, Your Honor.

18           THE COURT:  Is there anything else, Counsel?

19           MR. ROBINS:  No, Your Honor.  Thank you.

20           MS. OWENS:  No, Your Honor.  Thank you.

21           THE COURT:  All right.  I do want to make two comments

22   to Ms. Harrington.  I am sympathetic and I understand, and

23   you're probably disappointed that the sentence is not longer,

24   but I think you also realize that anything short of a fixed life

25   sentence is never going to provide you with the safety and

1    security that you deserve.  Unfortunately, that's not an option.

2    I simply did the best job I could in a very -- given the very

3    imperfect tools that I have at my disposal.

4         And to Mr. West, I wish you the very best of luck in

5    addressing these concerns and issues in your life, and I trust

6    you have learned from this and will not be sending letters of

7    this sort in the future.  That would not be a good idea.  I

8    think you will be looking at a sentence closer to what Mr.

9    Robins was asking for if this happens again.  But I do wish you

10   the best of luck.

11        If there is nothing else, we will be in recess, and

12   Ms. Gearhart may terminate the Zoom hearing.

13        (Proceedings concluded at 9:43 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


        I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that
the foregoing is a correct transcript of proceedings in the
above-entitled matter.








/s/  Tamara I. Hohenleitner              09/01/2022
_____        _____
TAMARA I. HOHENLEITNER, CSR, RPR, CRR    Date